UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| BRIAN GORDON, | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH, | § | |
| Defendant | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

DR. BRIAN GORDON, DVM, the plaintiff, complains of UNIVERSITY OF TEXAS MEDICAL BRANCH, the defendant, and for cause of action shows:

### I.   INTRODUCTION

1.      Plaintiff Brian Gordon, DVM, brings this civil action against his former employer Defendant University of Texas Medical Branch.  As described more fully below, Defendant violated Dr. Gordon's constitutional right to free speech and due process.  Defendant wrongfully terminated him from his employment and published defamatory statements that have damaged his reputation.  Defendant has violated the first and fourteenth amendments of the United States Constitution, the Texas Whistleblower Act, and the common law of the State of Texas.  Plaintiff has suffered significant damages as a result of this unlawful conduct.

### II.   PARTIES

2.      Plaintiff is Dr. Brian Gordon, DVM, who currently resides at 110 Crestview Drive, Belmont, North Carolina 28012.  During all times relevant to this lawsuit, Plaintiff was a resident

and domicile of Texas and the employee of Defendant University of Texas Medical Branch (UTMB). Plaintiff served as the Attending Veterinarian and Executive Director of the Animal Resource Center at UTMB.

3. Defendant University of Texas Medical Branch is a state agency and governmental body of Texas located in Galveston, Texas. Defendant receives federal funding for research. It maintains its principal place of business at 301 University Boulevard, Galveston, Texas 77555. UTMB is domiciled in Galveston County, Texas, and it may be served with process at its principal address. Defendant is a branch of the University of Texas system.

### III.   PERSONAL JURISDICTION

4. As a government unit of the State of Texas and a recipient of federal funding, Defendant UTMB has systemic and continuous contacts with the State of Texas and the United States of America. UTMB hired Plaintiff Dr. Gordon to serve as its Attending Veterinarian at its lab in Galveston, Texas, and this action arises out of his employment in that capacity and events that occurred within the state. For these reasons, this Court has general jurisdiction over Defendant for all matters to which it is a party and specific jurisdiction over Defendant for the claims raised herein. Therefore, this Court has personal jurisdiction over the parties in this civil action.

### IV.   SUBJECT MATTER JURISDICTION

5. This Court has subject matter jurisdiction pursuant to Section 1331 of Title 28 of the United States Code because this civil action concerns a federal question. Plaintiff Brian Gordon, DVM, is suing Defendant UTMB under federal law, specifically Section 1983 of Title 42 of the United States Code, for violating rights guaranteed to Plaintiff by the First and Fourteenth Amendments to the United States Constitution. Thus, this civil action arises under federal law. To the extent this complaint also alleges claims arising under Texas state law, those claims arise from

**PLAINTIFF'S ORIGINAL COMPLAINT**

the same nucleus of operative facts and are pendant to the federal claims. Therefore, this Court has subject matter jurisdiction over the entire lawsuit because it concerns a federal question and closely-related issues.

## V.   VENUE

6.      The U.S. District Court for the Southern District of Texas, Galveston Division, is the proper venue for this civil action because all or a substantial part of the events or omissions giving rise to the unlawful practices alleged in this complaint occurred in Galveston County, Texas.

## VI. FACTS

7.      Defendant UTMB operates the Galveston National Laboratory, a large-sized medical research facility that includes eight buildings and approximately 180,000 square feet of research space. The lab is widely-known for infectious disease research. They also conduct other types of studies, including work on burns and behavioral modification.  UTMB's Animal Resources Center has at times employed approximately sixty-five (65) to seventy (70) employees. They perform research on a variety of animal species. At any given time, the ARC might house as many as 4,000 mice, 500 rats, 20-50 non-human primates, 30 sheep, 20-25 pigs, and a range of ferrets, rabbits, guinea pigs, and other animal types.

8.      At UTMB and at similar research facilities, there are well-established procedures for formulating scientific studies involving animal research. The process involves a complicated interplay between scientists, funding agencies, and parties charged with oversight. For example, when a study is being planned at UTMB, the researcher must present sufficient scientific justification to warrant research on animals. Different classifications of studies require different levels of scientific justification because the desire to advance science must be balanced against the

interests of the animals being tested.  Once a study is approved, researchers must follow the protocols for that class of research to ensure that the lab animals do not suffer any decline in health that has not been intentionally sanctioned for that study.

9.      Defendant UTMB hired Plaintiff Dr. Gordon on March 1, 2013 as the Attending Veterinarian and Executive Director of the Animal Resources Center.

10.     The position of Attending Veterinarian at a research facility is a legally defined position that carries with it certain duties and obligations to ensure animal care and safety at that facility.  The federal Animal Welfare Act (AWA) and its implementing regulations require that a research facility must employ an Attending Veterinarian to provide adequate veterinary care to its animals.  9 CFR § 2.40.  They likewise require that a facility "shall assure that the attending veterinarian has appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use." 9 CFR § 2.40.

11.     Title 9 also requires that UTMB, as a research facility, maintain an Institutional Animal Care and Use Committee (IACUC) to oversee its animal research program and to ensure that the requirements of the Animal Welfare Act are being followed.  9 CFR § 2.31. For example, the IACUC must review the facility's program for humane care and use of animals as measured against Title 9 of the C.F.R. at least once every six months. 9 CFR § 2.31(c)(1). It likewise reviews every proposed research protocol at the lab, and approves, denies, or proposes modifications thereto. 9 CFR § 2.31(d).

12.     Plaintiff was highly qualified for his role at UTMB.  He had previously served as Director of Animal Resources and Attending Veterinarian at the Max Planck Florida Institute in Jupiter, FL from 2010 to 2013; Director of Scientific Support and Director of Comparative Medicine at Oklahoma Medical Research Foundation in Oklahoma City, OK from 2000 to 2009;

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    Page **4** of 23

Attending Veterinarian at Genzyme in Oklahoma City, OK from 2001 to 2009; and several other similar positions.

13.     During Plaintiff's employment with UTMB, he received one performance evaluation. This evaluation indicated that Plaintiff was meeting or exceeding expectations in his fulfillment of the duties of Attending Veterinarian. Throughout his employment at UTMB, Plaintiff believed he was maintaining the program he oversaw in full regulatory compliance with the U. S. Department of Agriculture (USDA), which is charged with enforcing the AWA. Nevertheless, he was prevented from doing so by UTMB leadership, as further described below.

14.     Despite Plaintiff's positive track record, UTMB's administration ignored many of his suggestions and restricted his authority to make decisions regarding animal care. His refusal to support practices that were not in line with the interests of the animals caused friction between Plaintiff and UTMB management. Ultimately Plaintiff was not given the power to ensure adequate veterinary care at all times within the facility, which is specifically required by the AWA. Subsequently, he learned that adequate veterinary care was not being provided in direct violation of AWA and in violation of his directives to his subordinates. Plaintiff was admonished for expressing his opinion related to animal care and safety at the facility, and he was criticized for not being a "team player." For example, in 2014 there were plans to build a primate facility below sea level. Plaintiff objected to this plan because it would put the animals at risk in the event of a severe storm, which is a common occurrence on the Gulf coast. On another occasion, he was told that he would be fired if he continued raising concerns regarding procedures affecting animal care. Then in late 2014 Plaintiff was written up for speaking out against procedures and practices he believed put animal health and safety in jeopardy. The expectation was the Dr. Gordon should

support whatever plans UTMB's administration proposed, regardless of whether he believed in his professional opinion that the plans would jeopardize animal welfare.

15.     The failures within the UTMB animal research program came into sharper focus in 2015 following an audit by the National Institute for Allergy and Infectious Disease (NIAID). The audit occurred in January 2015, and it concerned a UTMB study in which twelve monkeys were injected with the Marburg virus. NIAID had a contract for this research and they also provided its grant funding. A category pain level protocol was approved for this study. This meant the injected animals would experience pain and suffering as a result of the virus, and no relief would be administered for that pain and suffering. The animals were supposed to be humanely euthanized once their condition deteriorated to a certain degree, and researchers had specified that death was never supposed to be an endpoint. The pain specifications had been approved in the protocol and, therefore, the AWA required that they be followed. To that end, the protocol implemented a behavioral scoring table. If used appropriately, the scoring table would help researchers determine when a monkey should be euthanized to prevent the unnecessary pain and distress of being allowed to die. Failing to euthanize animals according to these approved protocols was a direct violation of 9 CFR § 2.31(d)(iii)(v) ("Animals that would otherwise experience severe or chronic pain or distress that cannot be relieved will be painlessly euthanized at the end of the procedure or, if appropriate, during the procedure.")

16.     In addition, the study's protocols governed what must occur when an animal died unexpectedly and without the benefit of humane euthanasia. As Attending Veterinarian, Plaintiff was supposed to be informed of any unexpected death during his regular rounds so that he could investigate the cause and determine whether the animals were being cared for appropriately. The death should also be reported at the next IACUC meeting so that the committee could explore what

**PLAINTIFF'S ORIGINAL COMPLAINT**                    Page 6 of 23

had happened.  These protocols were designed to ensure that these incidents were investigated by the parties charged with overseeing animal welfare at the facility, namely the Attending Veterinarian and the IACUC, in order to prevent unnecessary suffering.  They operated as a check to ensure that appropriately justified scientific research did not become institutional torture.

17.     NIAID prepared an audit report after completing its investigation in early 2015. The report identifies significant animal welfare concerns within UTMB's animal research program.  Defendant never shared the results of the NIAID audit with Plaintiff, despite the fact that federal law required Dr. Gordon to oversee all aspects of animal welfare.  Plaintiff made efforts to find out more details about the audit, but he was refused access to this information.  Although UTMB had hired Plaintiff to fill the role of Attending Veterinarian, Defendant was preventing Plaintiff from carrying out his statutory duties by withholding critical information regarding animal care.  When Plaintiff informed the chairman and other members of IACUC that NIAID had completed an audit, they also attempted to find out more details.

18.     Defendant never provided a copy of the audit report to Plaintiff or to the IACUC. Given that Plaintiff and the IACUC were charged with overseeing animal care at the facility, this failure to disclose disabled Plaintiff and the IACUC from investigating the problems NIAID found and fulfilling their duties under the Animal Welfare Act. Dr. Gordon eventually reviewed the report once a third party obtained a copy of it and forwarded it to him. The report is now publicly available online at http://www.niaid.nih.gov/about/organization/dmid/about/Documents/NIH-Quality-Audit-Report-STDY-13-0005-TG.pdf.

19.     Shortly thereafter, in approximately March 2015 Plaintiff learned from one of the other veterinarians employed by Defendant that details regarding the health of monkeys in Defendant's care had also been hidden from Plaintiff. Eight out of twelve monkeys in the Marburg

**PLAINTIFF'S ORIGINAL COMPLAINT**                                      Page 7 of 23

virus study had died unexpectedly and the deaths went unreported. This was the same study that had prompted the NIAID audit. Plaintiff had believed these animals had been humanely euthanized once their health deteriorated when in fact the injected animals had been allowed to suffer the pain and distress of dying. This occurred in direct violation of the study's protocols, the standards set forth in the AWA, and Dr. Gordon's orders. When the animals died unexpectedly without euthanasia, the death had gone unreported, and no investigation had been conducted as to whether they were being handled humanely.

20.     At least two UTMB employees had an obligation to report the monkey deaths to Plaintiff and to the IACUC for further follow-up. Both the study's director Jason Comer and the biocontainment veterinarian directly responsible for the monkeys' veterinary care Curtis Klages should have reported that the monkeys were dying during the research without receiving humane euthanasia. Had Plaintiff been informed of the deaths, he would have requested that the protocol be stopped in order to identify a better system of monitoring the animals than the behavioral scoring systems they were using. In fact, he was already aware of several alternative methods that could have been considered and instituted. Because he was never informed there was a problem, Dr. Gordon could not preserve the interests of the animals by implementing these more humane methods for monitoring the animals. This was a direct violation of the AWA requirement that alternatives be considered. 9 CFR § 2.31(d)(ii).

21.     Plaintiff later learned there had been a longstanding practice of hiding the true cause of animal deaths throughout the time he was employed by Defendant. UTMB had conducted similar research on monkeys involving Ebola and other lethal pathogens. Several hundred monkeys had been housed at Defendant's facility during Plaintiff's employment alone. Dr. Gordon never received reports that monkeys had died unexpectedly or without the aid of

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 8 of 23**

euthanasia. When Plaintiff inquired about the cause of death, he was consistently told they were euthanized according to protocol. This practice of hiding the true cause of animal deaths and preventing the Attending Veterinarian and IACUC from investigating those deaths violated approved protocols and federal requirements under the AWA. See 9 CFR § 2.33(a)(2). Once Plaintiff learned what was going on, he refused to keep the information secret. He feared these violations had long gone unchecked.

22.     Very soon after Plaintiff learned of the undisclosed primate deaths, he informed the IACUC. Dr. Gordon reported in good faith to the current IACUC chairman Ron Tilton and other IACUC members that UTMB had violated the AWA. He specifically told them that UTMB representatives had intentionally failed to disclose the unexpected deaths of at least eight primates at the facility despite their representations to the IACUC and other oversight agencies that all approved protocols were being followed.

23.     Beyond his refusal to forego compliance with federal animal welfare standards, Plaintiff likewise refused to reallocate funding in a manner he believed was illegal. In his role as Executive Director of the Animal Resource Center, Dr. Gordon was responsible for complying with human resources policy and managing the program budget for the ARC. The program received federal funds based on a per diem rate for housing animals at the facility. In Spring 2015 UTMB management directed Plaintiff to allocate costs from one part of the animal program to cover another portion of the animal program by making campus-wide adjustments to the per diem rates for animal care. The purpose of mis-characterizing funds in this manner was to access additional funding without exposing the problems identified in the NIAID audit. Plaintiff refused to do this because he believed it was illegal to misrepresent information in this manner, particularly

with respect to taxpayer money. There was friction between Dr. Gordon and the Associate Vice President of Research Toni D'Agostino because he refused to reallocate funds as directed.

24.     Thereafter, on approximately Saturday, June 6, 2015, Plaintiff wrote an email to the Vice Provost requesting a meeting to discuss his concerns about the problems within the animal research program at UTMB. They scheduled a meeting for Monday, June 8, 2015 at 10am. Dr. Gordon was never allowed to attend this meeting because he was notified that Monday that he was to be terminated instead and sent home before the meeting could take place.

25.     UTMB's actions caused Dr. Gordon to suffer tremendously. Plaintiff had long been a controlled diabetic. As UTMB administration took steps to restrict his authority over animal welfare and asked him to participate in conduct he believed was illegal, the stress of the situation caused Plaintiff's health to deteriorate rapidly. UTMB's conduct caused him tremendous mental duress, and he felt physically sick as a result. His diabetes suddenly became uncontrollable. His doctor's explanation for this dramatic change in his health was that stress was the cause. On one occasion Dr. Gordon left work to go to the emergency room because his blood glucose level had skyrocketed to well over 300, a very unsafe level. Plaintiff also suffered sleeplessness and weight loss. In addition, he felt the career he had built was crumbling around him. Despite his efforts to maintain UTMB's program in full regulatory compliance, he came to understand that UTMB's administration made that impossible. He felt like his career was damaged as a result.

26.     On the morning of Monday, June 8, 2015, UTMB issued Plaintiff a Notice of Intent to Terminate in a letter signed by Toni D'Agostino. From that moment he was denied access to his office and to his computer and files. Dr. Gordon made one final effort to protect animal welfare at the facility as the Attending Veterinarian. He made another good faith report of a violation of law to the IACUC. Dr. Gordon provided the chairman of the IACUC Mr. Tilton with a list of

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    Page **10** of **23**

thirteen deficiencies at the facility that jeopardized animal care in violation of the AWA. Since Plaintiff did not have access to his computer at the time, he provided this list verbally during a telephone conversation so that Mr. Tilton could share the information with the IACUC. Based on their conversation, Plaintiff understood that Mr. Tilton was writing down the list and would circulate the information to the other members of the IACUC.

27.     The next morning Plaintiff met with Ms. D'Agostino regarding the proposed termination. Plaintiff expressed his total disagreement with all of the allegations in the Notice of Intent to Terminate. He indicated the reasons given for his termination were false and motivated by personal animus. He also informed Ms. D'Agostino that they were violating his rights. Later that same day, within hours of their conversation, Ms. D'Agostino called Plaintiff to say that UTMB was officially terminating Dr. Gordon's employment effective June 9, 2015. Given the speed with which Ms. D'Agostino finalized his termination, Dr. Gordon believed his response was not given any meaningful consideration. There simply was no time for further investigation or any significant contemplation of his comments.

28.     Plaintiff continued to experience mental duress and sleeplessness after he left UTMB. He was devastated by his termination and he felt like the career he had built over several decades was now tarnished. He learned that UTMB was continuing to take action against him. He had a conversation with a science editor regarding animal care at UTMB. He learned that UTMB representatives had made negative and untruthful statements regarding his employment at UTMB to the science editor and possibly to others. He believed these statements damaged his reputation and his likelihood of finding subsequent employment of the same caliber as his position at UTMB.

29.     In September 2015 Plaintiff submitted a detailed complaint to the USDA regarding the problems he saw in the animal research program at UTMB. He described numerous problems in the research procedures at the facility that he believed threatened animal welfare. He identified multiple instances of illegal conduct by UTMB and UTMB representatives.

30.     Plaintiff made numerous efforts to obtain comparable employment with another organization after his employment ended at UTMB. When he applied for comparable positions in the field of veterinary medicine, the career he had spent twenty-five years developing, he was repeatedly turned down. He remained unemployed for approximately four (4) months. In order to make ends meet, he was forced to sell his house at a substantial loss. Because of his lack of income, he was also forced to relocate to a new city so that he could live with a friend. Then on October 13, 2015, he began a short-term posting with the USDA at a substantially reduced salary from what he earned at UTMB and his prior employers. The posting is expected to last for thirteen (13) months with the possibility that the agency will renew the posting for up to three (3) years. It is a junior position outside the field of veterinary medicine. In his short-term posting at the USDA he has no management expectations, he has been awarded no budget, he has no supervisory expectations, and his job responsibilities do not require his level of expertise.

31.     UTMB has a track record of being unable to retain employees to oversee animal care at its facility. UTMB has employed approximately five (5) different Attending Veterinarians in the past thirteen (13) years. All of them have solid credentials and appear to be well-qualified professionals capable of ensuring adequate animal care for its research programs. Nevertheless, UTMB has had a very high turnover rate for that position. In the same vein as Dr. Gordon, at least one other former Attending Veterinarian was terminated by UTMB and has been unable to find

subsequent employment in the field of veterinary medicine of the same stature and compensation level as the UTMB posting.

## VII. CLAIMS FOR RELIEF

### Claim 1 – Wrongful Termination for Refusal to Engage in Illegal Activity

32.     The preceding paragraphs are incorporated by reference in the following claim for relief.

33.     UTMB hired Plaintiff on March 1, 2013 as the Attending Veterinarian and Executive Director of the Animal Resources Center.

34.     Plaintiff worked tirelessly to provide adequate care to the animals in his care at UTMB and to carry out his legal duties as Attending Veterinarian.  In contrast, Defendant asked Plaintiff to keep quiet about the problems he saw pertaining to animal care at the facility and recommendations for needed changes.

35.     Plaintiff refused to engage in illegal activity during his employment at UTMB. Defendant asked Plaintiff to keep certain facts hidden from the IACUC and other oversight agencies. Defendant asked Plaintiff to reallocate costs and falsify documents in order to shift costs from one part of the program to another.  Each of these acts was an attempt to entice Plaintiff to engage in illegal activity.

36.     Plaintiff refused to engage in or support the continued violations of the Animal Welfare Act, Section 42.092 of the Texas Penal Code regarding cruelty to nonlivestock animals, Section 37.10 of the Texas Penal Code regarding tampering with a governmental record, or any other applicable law.  He refused to mislead members of the IACUC, the USDA, the NIAID, the Office of Laboratory Animal Welfare (OLAW) or any other agencies funding projects at the facility by allowing the unexpected deaths of animals to go unreported.  He also refused to engage

**PLAINTIFF'S ORIGINAL COMPLAINT**                                          Page 13 of 23

in fraud or misrepresentation by falsely reallocating costs from one part of the animal program to another part. Instead Plaintiff insisted on carrying out his statutory duties as Attending Veterinarian by ensuring the provision of adequate veterinary care at UTMB's research facility.

37.     Defendant intentionally and maliciously terminated Plaintiff's employment solely because he refused to commit these illegal acts.

38.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost back wages, lost future wages (i.e., front pay), loss of retirement benefits, loss of earning capacity, compensatory damages for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of reputation, loss of enjoyment of life, other non-pecuniary losses, and attorney's fees, costs, and expenses.

39.     Plaintiff has exhausted all applicable administrative prerequisites and has timely filed its claim against Defendant. Defendant has had actual notice of these impending claims.

### Claim 2 – Wrongful Termination under the Texas Whistleblower Act

40.     The preceding paragraphs are incorporated by reference in the following claim for relief.

41.     The defendant UTMB is a state government entity within the meaning of Texas Government Code Section 554.001.

42.     The plaintiff was a public employee within the meaning of Government Code Section 554.001. At all times relevant, the plaintiff was employed by Defendant.

43.     Plaintiff made a good faith report of particular and ongoing violations of law by a government agency when he informed the chairman of the IACUC Mr. Tilton that UTMB representatives had intentionally failed to disclose the unexpected deaths of multiple primates at

the facility despite their representations to the IACUC and other oversight agencies that all protocols were being followed at the facility. Plaintiff made this report a few months prior to the date on which UTMB determined to terminate him. In addition, approximately one day before he learned of his termination, Plaintiff made another good faith report of a violation of law when he provided the chairman of the IACUC Mr. Tilton with a list of thirteen deficiencies at the facility that jeopardized animal care in violation of the AWA.

44. The IACUC is an "appropriate law enforcement authority," as that term is used in Texas Government Code Section 554.001, because it has the authority to regulate under, investigate, and enforce the provisions of the Animal Welfare Act. Under Title 9, the IACUC committee is charged with assessing the research facility's animal program, facilities, and procedures. 9 CFR § 2.31(a). Specifically, the committee must review the facility's program for humane care and use of animals at least every six months, inspect the facilities at least every six months, prepare reports, and review and investigate complaints from personnel or the public regarding the care and use of animals at the research facility. 9 CFR § 2.31(c). The IACUC is authorized to make recommendations to the Institutional Office, review and approve proposed activities, and suspend any activity involving animals that do not meet certain standards. 9 CFR § 2.31(c) and (d).

45. Plaintiff suffered retaliation for making this report to the IACUC when UTMB terminated his employment on June 8, 2015, within months of him making his first and within days of him making his second good faith report to the IACUC.

46. As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost back wages, lost future wages (i.e., front pay), loss of retirement benefits, loss of earning capacity, compensatory damages for past and future

**PLAINTIFF'S ORIGINAL COMPLAINT**                                            **Page 15 of 23**

pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of reputation, loss of opportunities for career advancement, loss of enjoyment of life, and other non-pecuniary losses.

47.     Defendant's actions were malicious and motivated by ill will, spite, and evil motive, and taken for the purpose of injuring the plaintiff. An award of exemplary damages to the plaintiff is therefore appropriate to deter future similar misconduct.

48.     Plaintiff has exhausted all applicable administrative prerequisites and has timely filed its claim against Defendant. Defendant has had actual notice of these impending claims.

### Claim 3 – Violation of Free Speech Regarding Matters of Public Concern

49.     The preceding paragraphs are incorporated by reference in the following claim for relief.

50.     The concerns Plaintiff communicated to Mr. Tilton and the IACUC relating to the hidden deaths of primates and other problems at the facility were serious matters of legitimate public concern. These related to the welfare of animals at the facility, the operation of federally funded research programs, and illegal activity by a public entity.

51.     Defendant terminated Plaintiff's employment in retaliation for Plaintiff's protected speech on matters of legitimate public concern and in an attempt to silence Plaintiff's expression of additional protected speech. This was impermissible retaliation in violation of rights guaranteed by the First and Fourteenth Amendments of the United State Constitution. Defendant's actions deprived Plaintiff of his First Amendment rights, and these failures are made actionable by 42 U.S.C. §1983.

52.     Plaintiff has exhausted all applicable administrative prerequisites and has timely filed its claim against Defendant. Defendant has had actual notice of these impending claims.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                   Page **16** of **23**

53.     Defendant acted willfully, knowingly, purposefully, and with the specific intent of depriving Plaintiff of his First and Fourteenth Amendment rights to free speech on matters of legitimate public concern.

54.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost back wages, lost future wages (i.e., front pay), loss of retirement benefits, loss of earning capacity, compensatory damages for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of reputation, loss of opportunities for career advancement, loss of enjoyment of life, and other non-pecuniary losses.

55.     Defendant's actions were malicious and motivated by ill will, spite, and evil motive, and taken for the purpose of injuring the plaintiff.  An award of exemplary damages to the plaintiff is therefore appropriate to deter future similar misconduct.

### Claim 4 – Deprivation of a Liberty Interest without Due Process

56.     The preceding paragraphs are incorporated by reference in the following claim for relief.

57.     The Fifth and Fourteenth Amendments of the United States Constitution guarantee that Plaintiff cannot be deprived of a liberty interest without due process.  Plaintiff had a liberty interest in his employment with UTMB based on his esteemed reputation in the community as an accomplished veterinarian with expert knowledge and a longstanding career caring for animals.

58.     Defendant deprived Plaintiff of a liberty interest when Defendant terminated Plaintiff without due process and for reasons which were false and stigmatizing.

59.     Defendant published false and stigmatizing statements about Plaintiff's employment at UTMB and the reasons for termination to at least one member of the public.  There was no legitimate reason to publicize any information regarding Plaintiff's employment and

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    Page **17** of 23

termination other than to damage his standing in the community in order to deflect information that might rightly damage Defendant's own reputation instead.

60.     Plaintiff was never offered a meaningful opportunity to clear his name regarding the charges Defendant made against him. Plaintiff is hereby requesting that UTMB provide him with the opportunity to salvage his reputation through a name-clearing hearing.  Until and unless UTMB provides such a hearing to Plaintiff, his right to due process continues to be violated.

61.     As a result of Defendant's wrongful conduct, Plaintiff's reputation was seriously damaged to the extent that he has been unable to obtain employment of the same stature and at the same level of compensation as he had at UTMB and in prior positions.

62.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost back wages, lost future wages (i.e., front pay), loss of retirement benefits, loss of earning capacity, compensatory damages for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of reputation, loss of opportunities for career advancement, loss of enjoyment of life, and other non-pecuniary losses.

63.     Defendant's actions were malicious and motivated by ill will, spite, and evil motive, and taken for the purpose of injuring the plaintiff.  An award of exemplary damages to the plaintiff is therefore appropriate to deter future similar misconduct.

64.     Plaintiff has exhausted all applicable administrative prerequisites and has timely filed its claim against Defendant.  Defendant has had actual notice of these impending claims.

### Claim 5 – Defamation

65.     The preceding paragraphs are incorporated by reference in the following claim for relief.

66.     On at least one occasion, Defendant published false and defamatory statements regarding Plaintiff's employment and termination from UTMB. Defendant made these statements either orally or in writing to a member of the public who was a science editor.

67.     These statements were defamatory because they tended to injure Plaintiff's reputation and expose the Plaintiff to public hatred, contempt, ridicule, and financial injury related to his diminished ability to obtain employment. The statements also impeached his honesty and integrity.

68.     Defendant made the false and defamatory statements by negligently failing to state the truth. Defendant and Defendant's representative either knew or should have known that the statements were false.

69.     Defendant published the defamatory statements when it communicated them to a third party. This publication was not privileged because the third party had no legitimate interest in receiving information regarding Plaintiff's employment and termination and the statements were made with malice.

70.     Defendant acted with malice because it published the defamatory statements with knowledge that they were false or with substantial grounds for knowing that they might be false and with reckless disregard to whether they were true or false.

71.     As a result of Defendant's wrongful conduct, Plaintiff's reputation was seriously damaged to the extent that he has been unable to obtain employment of the same stature as he had at UTMB and in prior positions.

72.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost back wages, lost future wages (i.e., front pay), loss of retirement benefits, loss of earning capacity, compensatory damages for past and future

pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of reputation, loss of opportunities for career advancement, loss of enjoyment of life, and other non-pecuniary losses.

73.     Defendant's actions were malicious and motivated by ill will, spite, and evil motive, and taken for the purpose of injuring the plaintiff.  An award of exemplary damages to the plaintiff is therefore appropriate to deter future similar misconduct.

74.     Plaintiff has exhausted all applicable administrative prerequisites and has timely filed its claim against Defendant.  Defendant has had actual notice of these impending claims.

### VIII. DAMAGES

75.     As a direct and proximate result of result of Defendant's unlawful conduct, Plaintiff suffered significant injuries and damages.

76.     Plaintiff was discharged from employment with Defendant, suffering lost pay and benefits in the past, present, and future and loss of earning capacity.   Plaintiff lost retirement benefits as a result of his termination.  Although he sought other employment, he has been unable to find a job with comparable salary and benefits.  Instead, he has found a short-term posting at a significantly reduced salary with a severe reduction in responsibility and stature.  It is a junior position outside the field of veterinary medicine, the field he to which he has dedicated his twenty-five-year career.  In his short-term posting at the USDA he has no management expectations, he has been awarded no budget, he has no supervisory expectations, and his job responsibilities do not require his level of expertise. In addition, Plaintiff has incurred expenses in seeking other employment.

77.     Due to Defendant's termination of Plaintiff and his loss of income, Plaintiff was forced to sell his home at a loss.  He incurred costs related to that transaction, including realtor

fees and closing costs.  Defendant also incurred moving expenses and relocation costs, as he was forced to relocate to alternative housing.

78.      Plaintiff has suffered mental anguish, emotional distress, inconvenience, humiliation, embarrassment, loss of opportunities for career advancement, and damage to reputation.    Plaintiff has suffered this harm as a result of Defendant's conduct, his loss of employment and livelihood, and the defamatory statements made about him, and the violation of his rights.

79.      Plaintiff will also seek prejudgment interest, costs of court, and attorney's fees, costs, and expenses.

## IX. EXEMPLARY DAMAGES

80.      Defendant acted with oppression and malice with the purpose and intent of intimidating Plaintiff into engaging in an illegal act and/or to prevent him from reporting it.  The acts and omissions of Defendant complained of herein were committed with malice or reckless indifference to the protected rights of Plaintiff.  Plaintiff is, thus, entitled to exemplary damages in an amount sufficient to deter Defendant from such wrongful conduct in the future.

## X. JURY DEMAND

81.      In accordance with Federal Rule of Civil Procedure 38, Plaintiff Brian Gordon hereby demands a jury trial for all issues raised herein.

## XI. DEMAND FOR JUDGMENT

82.      WHEREFORE, Plaintiff BRIAN GORDON, DVM, requests that Defendant UNIVERSITY OF TEXAS MEDICAL BRANCH be cited to appear and answer, and on final trial, that the court enter judgment for Plaintiff Dr. Gordon and against Defendant UTMB.  In accordance with Federal Rule of Civil Procedure 8(a), Plaintiff demands relief for the following:

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 21 of 23**

a.  For back pay, plus prejudgment interest as provided by law, from the date of Plaintiff's termination until the date of judgment.

b.  For an award of the present value of front pay due to Plaintiff for a reasonable period following the date of the judgment, calculated as of the date of judgment.

c.  For additional compensatory damages in an amount within the jurisdiction of this court.

d.  For exemplary damages against the defendant in a sum determined by the trier of fact.

e.  For reasonable attorney's fees.

f.  For interest after judgment as provided by law.

g.  For costs of suit.

h.  Such other and further relief at law or equity to which Plaintiff may be entitled.

Respectfully submitted,

**SILVERMAN LAW GROUP**
501 North IH-35
Austin, TX 78702
Office (512) 485-3003
Fax (512) _____
daphnesilverman@gmail.com

_____
Daphne Pattison Silverman
TX State Bar No. 06739550

**LAW OFFICE OF JENNIFER D. WARD**
501 North IH-35
Austin, TX 78702
Office (512) 485-3003
Fax (512) 533-0857
jennifer@jdwlawoffice.com

_____
Jennifer D. Ward
TX State Bar No. 24090459

**PLAINTIFF'S ORIGINAL COMPLAINT**                           Page **22** of 23

**ANIMAL LEGAL DEFENSE FUND**
170 E. Cotati Ave.
Cotati, CA 94931
Tel: (707) 795-2533 ext. 1041
Fax: (707) 795-2780
Email: cberry@aldf.org

Christopher A. Berry
CA State Bar No. 283987
*Pro hac vice* pending